# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

MICHELET ELIASSAINT,

      Plaintiff,

v.                                   Case No. 8:19-cv-3001-KKM-CPT

RTG FURNITURE CORP.,

      Defendant.

_____/

## ORDER

Defendant RTG Furniture Corporation (RTG) moves for summary judgment against Plaintiff Michelet Eliassaint on all counts. (Doc. 28). After reviewing the motion, Eliassaint's response in opposition (Doc. 33), the parties' statement of undisputed facts (Docs. 29 & 34), RTG's reply (Doc. 40), and the record, the Court grants the motion in full for the reasons discussed below.

## I.    PROCEDURAL HISTORY

On December 6, 2019, Eliassaint filed a ten-count complaint against Rooms To Go Central Corp., alleging a discrimination claim based on race and national origin under 42 U.S.C. § 1981, Title VII, and the Florida Civil Rights Act (FCRA); a hostile work environment claim under § 1981 and Title VII; a retaliation claim under § 1981, Title VII, and the FCRA; a negligent retention claim; and a negligent infliction of emotional distress claim. (Doc. 1). Rooms To Go Central Corporation answered Eliassaint's complaint on February 28, 2020. (Doc. 9). Around eight months later, the

parties moved to substitute RTG for Rooms To Go Central Corp. after "[counsel] for [Eliassaint] . . . discovered the correct Defendant is RTG Furniture Corp." (Doc. 14). The Court granted the motion. (Doc. 15). After completing discovery and mediation—which resulted in an impasse, (Doc. 21)—RTG now files a motion for summary judgment on Eliassaint's claims, (Doc. 28), which Eliassaint opposes, (Doc. 33).

## II.    FACTUAL BACKGROUND

In 1986, Eliassaint moved to the United States from Haiti. (Doc. 29-1 at 4). He started working for RTG as a truck loader in RTG's distribution center in Seffner, Florida, around ten years later. (*Id.* at 5–6). RTG engages in the retail sale of furniture and operates numerous distribution centers to supply its retailers. (Doc. 34 at 1). After working as a loader, Eliassaint "went to Shop tech to fix furniture." (Doc. 29-1 at 7). He then "went to Shop," eventually becoming a Shop Supervisor and transferring to the Lakeland location. (*Id.* at 8). Not long after his transfer to Lakeland, he started as the Shop Area Supervisor for the second shift. (*Id.* at 9). Eliassaint worked as the Shop Area Supervisor for the second shift for fifteen years—from 2005 to 2020. (*Id.* at 9). As Shop Area Supervisor, Eliassaint oversaw furniture repairs; supervised and disciplined associates; and conducted performance reviews. (Doc. 34 at 3). For most of his time as Shop Area Supervisor, Tony Wilson was Eliassaint's supervisor. (*Id.*).

In his supervisory position, Eliassaint's salary increased from $30,000 to $50,000 over the course of fifteen years. (Doc. 29-1 at 10). In addition to his salary, Eliassaint was eligible to earn bonuses through RTG's tri-annual bonus plan. (Doc. 34 at 3). Under

the plan, employees could earn three bonuses per year based on their performance rating issued by management. (*Id.* at 4). The performance ratings included "S" (for superior performance), "A" (for excellent performance), "B" (for above average performance), "C" (for average performance), and "D" (for below average performance), and the amounts spanned from zero dollars (for a D rating) to one-thousand dollars (for an S rating). (*Id.*). Supervisors' ratings and bonuses turned on several criteria, including performance, work ethic, technical skills, leadership skills, and original ideas. (*Id.*). Eliassaint most frequently received B and C bonuses. (Doc. 29-1 at 11). Wilson, Eliassaint's supervisor, explained that Eliassaint often sent emails and prepared performance reviews with misspellings and other grammatical mistakes that made it difficult for people to understand him. (Doc. 34 at 4). Although his writing skills temporarily improved while he took some college writing classes, Eliassaint's mistakes soon resurfaced, and Wilson had to make frequent corrections to the performance reviews that Eliassaint drafted. (*Id.* at 5). According to Wilson, Eliassaint also did not supervise other employees well and disliked handling issues that came up with employees under his supervision. (*Id.* at 6). Instead, Eliassaint leaned on other coworkers to resolve those issues for him. (*Id.*).

Eliassaint's claims largely rest on the statements and conduct of Brian Beckham, a shift manager, and Nate Reed, an operations manager, who both worked at RTG's Lakeland warehouse with Eliassaint. (Doc. 29-1 at 13; Doc. 34 at 10). In his deposition, Eliassaint explained that the discriminatory conduct and harassment began when he

started working with Beckham and Reed. (Doc. 29-1 at 15). Eliassaint alleges that, in 2013, Beckham punched him in the groin and then, in 2015, punched him in the lower back while Eliassaint was in the bathroom. (*Id.*). Eliassaint also alleges that Beckham told him "[w]hen you go back to Haiti[,] you should sell [your wife] for $50.00"; called him "dumb" more than once; stated that "Haitians always use machetes to cut people's heads off"; called Eliassaint "the Haitian"; and asked Eliassaint not do "do voodoo on me." (Doc. 29-1 at 36–37; Doc. 34 at 10). Additionally, Reed allegedly stated that because he is "a white man, [he] can't write [Eliassaint's] name" and that "[b]ecause [Eliassaint is] Haitian[,] it is hard for [him] to speak English and write." (Doc. 34 at 11). When Eliassaint wore a jersey into work one Friday, Reed also asked Eliassaint "why [he was wearing it], Haiti does not have a soccer team" and poked him in the chest. (Doc. 29-1 at 27; Doc. 34 at 11). Eliassaint alleges that these statements were made during 2016 (or prior) and 2017. (Doc. 29-1 at 26–27; Doc. 34 at 10–11).

On October 9, 2017, Beckham asked Eliassaint to send a technician to Bay 36, an area in the "south side" of the warehouse. (Doc. 34 at 6; Doc. 29-1 at 67). Eliassaint delegated the task to a subordinate. (Doc. 34 at 6). When Beckham and Reed went to Bay 36 shortly thereafter, they noticed a technician had not arrived and again asked Eliassaint to send a technician there. (*Id.* at 6–7). Eliassaint grew angry with the men and started walking away from them. (*Id.* at 7). Reed told Eliassaint to stop walking away and to "quit being insubordinate." (*Id.*). Eliassaint claims that Beckham and Reed were screaming at him and were "in [his] space." (*Id.*). The day after the incident,

Eliassaint filed a complaint with the human resources department, alleging he had been harassed and discriminated against by Beckham and Reed. (Doc. 34 at 8). This was the first time Eliassaint approached human resources about Beckham or Reed's alleged harassment and discrimination. (Doc. 29-1 at 24). The human resources representative immediately initiated an investigation. (Doc. 34 at 8). She interviewed seventeen employees from the Lakeland warehouse (including Reed, Beckham, and Wilson) in the approximately three-month-long investigation. (*Id.* at 9). On January 8, 2018, the human resources department sent a letter to Eliassaint, informing him that it found "no evidence to support unlawful discrimination or harassment." (*Id.* at 8–9).

On April 30, 2018, Eliassaint submitted two requests to transfer to different positions, citing "better opportunity 3:[00] p.m. to 11:30 p.m." and "better shift 3:00 p.m. to 11:30 p.m." as his reasons for his transfer applications and a "family issue" for his reason for leaving the Shop Area Supervisor role. (Doc. 34 at 9; Doc. 29-1 at 166, 168). In his requests, Eliassaint asked to be transferred to the Lift Department in the Annex warehouse and to the CC Department in the Lakeland warehouse. (Doc. 34 at 9). In response, RTG offered him a lift operator position for the second shift at the Annex warehouse or the 5k shift at the Lakeland warehouse. (Doc. 34 at 9). Eliassaint rejected both transfer offers because of the pay differential between them and his Shop Area Supervisor role, where he elected to remain. (*Id.* at 10). Then, on February 25, 2019, Eliassaint filed a charge of discrimination with the Equal Employment

Opportunity Commission (EEOC). (Doc. 34 at 14). His right-to-sue notice was issued on July 16, 2019, and he timely filed this lawsuit on December 6, 2019. (Doc. 1 at 7).

In April 2020, RTG furloughed Eliassaint for approximately three months. (Doc. 29-1 at 7). Wilson explained that many employees on second shift were furloughed and there were not "enough people [working] to bring Eliassaint back." (Doc. 29-3 at 19). Because Eliassaint was junior to the other second shift Shop Area Supervisor, Eliassaint—rather than the more senior second shift Shop Area Supervisor—was furloughed. (*Id.*). Wilson "got a list on who was getting furloughed, and that list consisted of . . . [employees'] hire dates" and "the ones that had seniority over other ones, they didn't get furloughed." (*Id.* at 19). In July 2020, RTG brought Eliassaint back as an assistant manager for customer pick-up (CPU) in Lakeland—the position he currently holds at RTG. (Doc. 29-1 at 20–21).

## III.   LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party can show that no genuine dispute of material fact exists by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *In re Optical Techs., Inc.*, 246 F.3d 1332, 1334 (11th Cir. 2001) (explaining that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" (quotation omitted)).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). When deciding whether the movant has met this burden, "the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.* Once the movant's initial burden is met, the burden shifts to the nonmovant to "come forward with specific facts showing that there is a genuine issue for trial." *Id.* (quotation omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1321 (11th Cir. 1999).

## IV.   ANALYSIS

### a. Race Discrimination under Title VII, the FCRA, and 42 U.S.C. § 1981

Eliassaint brings a claim of race and national origin discrimination under Title VII, the FCRA, and 42 U.S.C. § 1981. (Doc. 1 at 8, 14, 19). Because "[t]he FCRA is modeled after Title VII, and claims brought under it are analyzed under the same framework," the "FCRA claims do not need separate discussion and their outcome is the same as the federal claims." *Fuller v. Edwin B. Stimpson Co.*, 598 F. App'x 652, 653 (11th Cir. 2015). Likewise, "[t]he elements of a section 1981 claim in the employment

7

context are the same as the elements of a Title VII claim." *Harrison v. Belk, Inc.*, 748 F. App'x 936, 941 (11th Cir. 2018). As a result, the Court discusses the claims under Title VII, the FCRA, and § 1981 together and, for the reasons below, grants summary judgment on Eliassaint's race and national origin discrimination claims.

### i. Legal Standard

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII discrimination claim through the introduction of direct evidence, circumstantial evidence, or statistical proof of discrimination. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).

When direct evidence of discrimination is unavailable, a Title VII plaintiff may present circumstantial evidence of discrimination under the *McDonnell Douglas* burden-shifting framework to create a jury question. *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001). "Under this framework, the plaintiff shoulders the initial 'burden . . . of establishing a prima facie case of racial discrimination.'" *Id.* at 1258 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). A prima facie case generally consists of the following elements: "(1) the plaintiff was a member of a protected class; (2) he was qualified to do the job; (3) he was subjected to an adverse

8

employment action; and (4) he was treated less favorably than similarly situated individuals outside his protected class." *Fuller*, 598 F. App'x at 653.

An adverse employment action includes "ultimate employment decisions" like "termination, failure to hire, or demotion." *Blue v. Dunn Const. Co.*, 453 F. App'x 881, 884 (11th Cir. 2011) (quotation omitted); *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (explaining that a "tangible" or "adverse" employment action consists of "things that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone"). Actions that fall short of ultimate employment decisions are also actionable if the employer's actions, "in some substantial way, alter the employee's compensation, terms, conditions, or privileges of employment"; "deprive him or her of employment opportunities"; or "adversely affect his or her status as an employee." *Blue*, 453 F. App'x at 884 (quotation omitted); *Monaghan*, 955 F.3d at 861 ("[M]istreatment based on race or other prohibited characteristics, including subjection to adverse conditions, is actionable even if the mistreatment does not rise to the level of a tangible employment action, but only if the mistreatment is 'sufficiently severe or pervasive' that it can be said to alter the terms, conditions, or privileges of employment."). An employer's action is "substantial" when a plaintiff demonstrates that he "suffered a *serious and material* change in the terms, conditions, or privileges or employment." *Blue*, 453 F. App'x at 884 (quotation omitted).

As to the fourth element of the prima facia case, to show that he was treated less favorably than other similarly situated individuals, a plaintiff must identify a comparator and show that he and his comparator are "similarly situated in all material respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1226 (11th Cir. 2019). Although this standard is "worked out on a case-by-case basis, in the context of individual circumstances," *id.*, ordinarily, a similarly situated comparator "in all material respects" will "(1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; (4) and share the plaintiff's employment history," *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021) (citing *Lewis*, 918 F.3d at 1227–28). "A plaintiff's failure to produce evidence showing that a single similarly situated employee was treated more favorably will preclude the establishment of a prima facie case." *Id.*

If a plaintiff proves the prima facie case by a preponderance of the evidence, then the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas Corp.*, 411 U.S. at 802; *see Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). If the defendant carries this burden, then the plaintiff may "have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253; *see Silvera*, 244 F.3d at 1258. But of course, "[t]he ultimate burden of

persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

### ii. Analysis

In its summary judgment motion, RTG argues that Eliassaint's discrimination claims fail because "(1) there is no direct evidence of discrimination, (2) [Eliassaint] cannot establish a prima facie case under the *McDonnell Douglas* burden-shifting framework, and (3) there is no evidence of pretext." (Doc. 28 at 7). The Court agrees.

To begin, because Eliassaint neither presents any direct evidence nor makes any argument to that end, the Court looks to circumstantial evidence to establish Eliassaint's discrimination claim and applies the burden-shifting framework set forth in *McDonnell Douglas*. Turning to the prima facie case, Eliassaint—who is black and Haitian—is a member of a protected class. And RTG does not dispute that Eliassaint is qualified for his position as a Shop Area Supervisor. Thus, the only remaining issues to establish a prima facie case of discrimination are whether Eliassaint was subject to an adverse employment action and whether similarly situated employees outside his protected class were treated more favorably. *See Hall v. Dekalb Cty. Gov't*, 503 F. App'x 781, 788 (11th Cir. 2013).

Construing Eliassaint's pleadings in the light most favorable to him, Eliassaint contends that he suffered four adverse employment actions: (1) RTG did not provide him a cell phone to conduct business, (Doc. 33 at 14); (2) RTG offered Eliassaint a "proposed pay cut and demotion," (*id.* at 3); (3) Eliassaint was furloughed in 2020, (*id.*

11

at 3, 14); and (4) Eliassaint did not receive the "full Tri Annual Bonuses," (*id.* at 3). But not all of these complaints constitute adverse employment actions. The Court will address each action in turn.

First, Eliassaint alleges that he was "the only Shop Supervisor who was not provided a cellular device in order to conduct business" and that "instead [he] was made to use his personal cellular phone when handling [RTG's] affairs." (Doc. 33 at 14). He alleges that all RTG's other Shop Area Supervisors, none of whom were black Haitians, "were provided with cellular devices to conduct [RTG's] affairs." (*Id.*). But Eliassaint has not explained or demonstrated how the failure to have a company cell phone substantially altered the terms or conditions of his employment, deprived him of employment opportunities, or adversely affected his status as an employee. In short, the record fails to support that Eliassaint suffered a *serious and material* change in the terms, conditions, or privileges or employment because he did not have a company cell phone. Indeed, the only comment Eliassaint made about the cell phone in his deposition merely described his understanding: he was told that "everybody [receives] a smart phone" when they are "promoted [to] a Shop manager" but stated that he "didn't receive it and all the other manager[s] . . . in [his] position" did. (Doc. 29-1 at 38). Not all offensive conduct constitutes an adverse employment action under Title VII. *See Monaghan*, 955 F.3d at 860 (explaining that "Title VII makes discriminatory treatment actionable only if it reaches a sufficient level of substantiality" and that "[t]rivial slights are not actionable"). Considering that Eliassaint points to no

evidence—and the Court can find none in the record—that shows that not having a company cell phone caused any tangible harm to Eliassaint or substantially altered his employment conditions, the failure to provide Eliassaint a company cell phone fails to constitute an adverse employment action.[1] *See Hall*, 503 F. App'x at 788 (concluding that the district court did not err in holding that the plaintiffs' restricted use of certain resources was not an adverse employment action when "they failed to demonstrate any tangible harm resulting from these limitations").

Second, Eliassaint claims RTG discriminated against him by "propos[ing a] pay cut and demotion." (Doc. 33 at 3). Although adverse employment actions can include transfers, pay cuts, and demotions, Eliassaint has failed to show that occurred here. In April 2018, Eliassaint made two transfer requests. RTG responded to his requests for transfer by offering him two lift operator positions. Citing the pay differential between the lift operator position and apparently viewing the position as a demotion, Eliassaint declined to take either position and remained in his role as Shop Area Supervisor. Eliassaint's refusal to take an offered position—after he requested a transfer—is distinct from an actual pay cut and demotion. In short, no adverse employment action occurred.

---

[1] Of course, even if the Court were to consider RTG's failure to provide a cell phone to Eliassaint an adverse employment action, this allegedly discriminatory act is time barred under Title VII and the FCRA. A plaintiff in Florida must file an EEOC charge within 300 days of the alleged unlawful employment act under Title VII and file a FCRA complaint within 365 days of the alleged FCRA violation under the FCRA. *Wen Liu v. Univ. of Miami Sch. of Med.*, 693 F. App'x 793, 797 (11th Cir. 2017); § 760.11(1), Fla. Stat. Any untimely acts are barred. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–15 (2002). In his complaint, Eliassaint alleges that RTG failed to give him a cell phone "in or around 2016," (Doc. 1 at 3), approximately two to three years before Eliassaint filed his EEOC charge on February 25, 2019, and significantly outside the limitations period.

13

*See Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 n.10 (11th Cir. 2000) (explaining that a "proposed[,] uneffectuated transfer is not an adverse employment action"); *see Adamson-James v. Fla. Dep't of Corr.*, No. 6:11-cv-628-ORL-36TBS, 2013 WL 6231265, at *10 n.7 (M.D. Fla. Dec. 2, 2013) (noting that the employer's offer to remain in the same office but with a lesser title "[did] not amount to an adverse employment action because [the plaintiff] declined [that] option"). Considering that Eliassaint cannot show any tangible harm or that his employment conditions were substantially altered because he declined to accept the proposed transferee positions, Eliassaint's "proposed pay cut and demotion" fails to constitute an adverse employment action.

Third, being furloughed—i.e., being put on leave without pay—generates a tangible harm and materially alters an employee's status with his employer. Thus, it qualifies as an adverse employment action. Fourth, in a cursory manner, Eliassaint mentions that he did not receive "the full Tri Annual bonuses." (Doc. 33 at 3). Like being put on leave without pay, failing to receive additional compensation or bonuses could constitute an adverse employment action.

Although being furloughed and failing to receive the full tri-annual bonuses might constitute adverse employment actions, Eliassaint fails to show that he was treated less favorably than similarly situated people outside of his protected class. Namely, Eliassaint fails to sufficiently allege any comparator related to each employment action. A meaningful comparator analysis is a necessary part of the prima facie case that a plaintiff must prove under the *McDonnell Douglas* framework. *Lewis*, 918

14

F.3d at 1224. Thus, to order to defeat summary judgment, a Title VII plaintiff proceeding under *McDonnell Douglas* must show that he was treated less favorably than "similarly situated" individuals outside of his protected class. *Id.*

In a conclusory manner, Eliassaint alleges that he was "the sole Shop Supervisor furloughed despite his tenure with [RTG]"; that his "non-black, non-Haitian Shop Supervisors were not furloughed during this time"; and that "[RTG] did not furlough some associates with less experience than [Eliassaint]." (Doc. 33 at 14–15). Yet Eliassaint does not identify *any* comparator or explain how Eliassaint and his comparator are "similarly situated in all material respects."[2] *Lewis*, 918 F.3d at 1226.

As for the tri-annual bonuses, Eliassaint again identifies no comparator in any of his pleadings. *See generally* (Docs. 1 & 33). He fails to point to any other employee that received a higher bonus than he did, much less one "similarly situated in all material respects." *Lewis*, 918 F.3d at 1226. Without any showing that he was treated less favorably than other similarly situated employees outside his protected class, Eliassaint cannot prove a prima facie case of discrimination. *See Earle*, 843 F. App'x at 166 ("A

---

[2] Eliassaint states that none of the "non-black, non-Haitian Shop Supervisors" were furloughed. (Doc. 33 at 15). But Eliassaint does not specifically identify a single similarly situated employee treated more favorably than him, much less explain how a comparator engaged in the same basic conduct as Eliassaint, was subject to the same employment policies, was under the jurisdiction of the same supervisor, or shared Eliassaint's employment history. *See Earle*, 843 F. App'x at 166. Pointing generally to a group is simply insufficient where Eliassaint has not shown how he is "similarly situated in all material respects" to those comparators. To the extent that other "Shop Supervisors" are similar because they hold the same job title as Eliassaint, sharing a job title, standing alone, is not dispositive. *See Lewis*, 918 F.3d at 1228 (explaining that "a valid comparison will not turn on formal labels, but rather on substantive likenesses").

plaintiff's failure to produce evidence showing that a single similarly situated employee was treated more favorably will preclude the establishment of a prima facie case."). This fatal omission of a similarly situated comparator warrants judgment on these claims in favor of RTG.

Still, even if the Court were to decide that Eliassaint had shown a sufficient comparator and met his burden of proving a prima facie case, Eliassaint has not shown that RTG's nondiscriminatory reasons for furloughing Eliassaint or awarding him certain bonuses were mere pretext. RTG presented evidence that Eliassaint was furloughed due to a reduction in its staff caused by COVID-19 and its seniority policy. Specifically, RTG furloughed many associates; RTG made furlough decisions based on seniority; and RTG furloughed Eliassaint over the other Shop Area Supervisor who worked on second shift because she was more senior than Eliassaint. (Doc. 29-3 at 80). RTG also presented evidence through Wilson's deposition that Eliassaint's bonuses were tied to his work performance. (Doc. 29-5 at 22–8). Thus, RTG has successfully articulated legitimate, nondiscriminatory reasons for furloughing Eliassaint—COVID-19 and its seniority policy—and awarding him certain bonuses—his work performance. *Lewis*, 918 F.3d at 1221 ("If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions."). With the burden shifted back to him, Eliassaint has failed to "demonstrate that [RTG's] proffered reason was merely a pretext for unlawful discrimination." *Id.* Indeed, Eliassaint has neither offered argument nor pointed to any evidence showing

that RTG's stated reason was false or that the reason for the adverse action was discriminatory. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (explaining that "a reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason"). Rather than create an issue of material fact, the Court can find no evidence (and Eliassaint points to none) that shows RTG's legitimate, nondiscriminatory reason for furloughing Eliassaint was merely pretext for a discriminatory one. Accordingly, the Court grants RTG's motion for summary judgment on Eliassaint's discrimination claims.

### b.  Hostile Work Environment under Title VII and 42 U.S.C. § 1981

Eliassaint brings a hostile work environment claim under Title VII and 42 U.S.C. § 1981. (Doc. 1 at 10, 16). The Court will discuss the hostile work environment claims under Title VII and § 1981 together because both statutes "have the same requirements of proof and use the same analytical framework." *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002); *Mahone v. CSX Transp., Inc.*, 652 F. App'x 820, 823 n.5 (11th Cir. 2016).

### i.  Legal Standard

Title VII is violated when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotation omitted). To establish a hostile work environment claim, a plaintiff must show: "(1) that he belongs to a

protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

"The fourth element requires a plaintiff to show that his work environment is both subjectively and objectively hostile." *Fortson v. Carlson*, 618 F. App'x 601, 606 (11th Cir. 2015). "A plaintiff must subjectively perceive the harassment as sufficiently severe or pervasive to alter the terms or conditions of his employment, while the objective severity of harassment is judged from the perspective of a reasonable person in the plaintiff's position." *Id.* "In determining the objective element, a court looks to 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

## ii. Analysis

RTG argues that Eliassaint cannot establish the fourth element of the hostile work environment claim—that he faced severe or pervasive harassment that altered the

conditions of his employment. (Doc. 28 at 13). The Court agrees. The record and pleadings reveal that approximately eight comments were made over the course of 2016 (or prior) and 2017 that Eliassaint alleges constituted a hostile work environment. Those comments include: (1) "[w]hen you go back to Haiti you should sell [your wife] for $50.00," (Doc. 1 at 4; Doc. 29-1 at 95–96); (2) "dumb," (Doc. 28 at 15); (3) "Haitians always use machetes to cut people's heads off," (Doc. 1 at 4; Doc. 29-1 at 94); (4) "the Haitian," (Doc. 28 at 15); (5) "don't do voodoo on me," (Doc. 29-1 at 94); (6) "I am a white man, I can't write your name," (Doc. 28 at 15); (7) in reference to Eliassaint's jersey, "[w]hy you wear that, Haiti does not have a soccer team," (Doc. 1 at 4; Doc. 29-1 at 66–67); and (8) "[b]ecause you're Haitian it is hard for you to speak English and write," (Doc. 1 at 4).

RTG argues that "all of these alleged comments are time-barred for purposes of Eliassaint's Title VII hostile work environment claim and should not be considered in analyzing the claim." (Doc. 28 at 15). Unlike discrete discriminatory acts, a hostile work environment claim consists of a series of separate acts that collectively constitute one "unlawful employment practice." *Morgan*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). With respect to the timely filing provision, "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id*; *Shields*, 305 F.3d at

19

1281–82 (explaining that "a hostile work environment claim should be reviewed in its entirety, so long as one of the events comprising it [falls] within the statute of limitations"). Although Eliassaint is unsure of the exact date that Beckham and Reed made the comments, the most recently alleged comment occurred in October 2017. (Doc. 29-1 at 37). Eliassaint filed his EEOC charge on February 25, 2019, around sixteen months after Eliassaint's last alleged comment (i.e., component act of the claim). Thus, even the most recently alleged component act falls outside the statutory period of three hundred days. In the absence of Eliassaint identifying any component act that falls within the statutory limitation period, Eliassaint cannot establish the timeliness of his hostile work environment claim.

Even if Eliassaint's hostile work environment claim was timely, his claim still fails because Eliassaint makes no allegation that his workplace was permeated with discriminatory intimidation, ridicule, and insult, such that the terms and conditions of his employment were altered. Applying a subjective standard, Eliassaint makes no allegation that he perceived the harassment as severe or pervasive enough to alter the terms of his employment. Indeed, in his deposition, Eliassaint flatly denied that Beckham and Reed's comments changed the conditions of his employment or affected his job performance. (Doc. 29-1 at 38). Eliassaint stated that he "always [did his] best," was "never late," never had to take days off, and that he had "anxiety kicking in, but to interfere for my job, for my performance, no. I'm a professional, you know. I do my job with my ability." (*Id.*). And, in his response to RTG's statement of undisputed facts,

Eliassaint admits that he "testified that the conduct and statements he was purportedly subjected to did not interfere with his job performance." (Doc. 34 at 12). Thus, by Eliassaint's own admission, the conduct and statements were not sufficiently severe or pervasive to alter the conditions of his employment or prevent him from doing his job. *See McCann*, 526 F.3d at 1379 (explaining that the plaintiff's hostile work environment claim failed where, although the plaintiff alleged that she was upset by the racially derogatory language, "she [had] not demonstrated that the alleged environment interfered with her job performance," especially where she "testified that it did not affect her work").

Eliassaint has also fails to show that his alleged harassment was objectively severe or pervasive enough to support a hostile work environment claim under Title VII. Evaluating the circumstances from the perspective of a reasonable person in Eliassaint's position and considering the frequency of the conduct; the severity of the conduct; whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and, whether the conduct unreasonably interferes with the employee's job performance, the Court determines that Eliassaint's allegations fail to create a hostile work environment. *See Fortson*, 618 F. App'x at 606. Given that offensive utterances—rather than physically threatening or humiliating conduct—are at issue, the severity of the conduct is low.[3] The frequency is also low considering that these eight or so

---

[3] Although Eliassaint points to Beckham's two punches as evidence of physical conduct, (Doc. 1 at 11), these occurrences, which occurred in 2013 and 2015, are time-barred as discussed above.

statements spanned at least two years. *Compare Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 807 (11th Cir. 2012) (holding that the plaintiff failed to show the alleged harassment was sufficiently frequent to support her claim where "only a few dozen comments . . . that could arguably be construed as harassment" occurred "over a period of eleven months"), *and McCann*, 526 F.3d at 1379 (holding that the evidence presented by the plaintiff was insufficient to support a claim of hostile work environment, explaining that the instances of racially derogatory language, which extended "over a period of more than two years . . . are too sporadic and isolated to establish that her employers' conduct was so objectively severe or pervasive as to alter the terms and conditions of her employment"), *with Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251–55 (11th Cir. 2014) (concluding the record presented a genuine dispute of material fact for certain plaintiffs' hostile work environment claims where racist graffiti appeared in employee bathrooms "daily"; employees and supervisors wore Confederate flags "every day"; racist slurs were used "every day"; and nooses were hung in the workplace on multiple occasions). And, as discussed, the record fails to reveal evidence that shows the conduct unreasonably interfered with Eliassaint's job performance. *See* (Doc. 29-1 at 38). Thus, even taking all the statements as true and viewing them in the light most favorable to Eliassaint, the Court finds that, under the totality of the circumstances and

---

Eliassaint also fails to provide evidence that shows this harassment was based on his race or national origin and fails to show that RTG knew or should have known about these incidents in order for RTG to be responsible under a theory of vicarious or direct liability. *See McCann*, 526 F.3d at 1378–79.

in the light of these factors, a reasonable person would not find the alleged harassment sufficiently severe or pervasive so as to alter the terms or conditions of the Eliassaint's employment. *See Adams*, 754 F.3d at 1251.

### c. Retaliation under Title VII, the FCRA, and 42 U.S.C. § 1981

Eliassaint brings a claim of retaliation under Title VII, the FCRA, and 42 U.S.C. § 1981. (Doc. 1 at 12, 17, 21). Because retaliation claims under Title VII, the FCRA, and § 1981 are analyzed under the same framework, the Court discusses them together and their outcomes are the same. *See Alvarez*, 610 F.3d at 1271 (explaining that the analysis is the same for retaliation claims under Title VII and the FCRA); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (explaining that the same elements apply to retaliation claims under Title VII and § 1981). For the reasons explained below, the Court grants RTG's motion for summary judgment on Eliassaint's retaliation claims.

### i. Legal Standard

"Under the anti-retaliation provision in Title VII of the Civil Rights Act, an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice' or 'has made a charge' about an unlawful employment practice under Title VII." *Debe v. State Farm Mut. Auto. Ins. Co.*, No. 20-11331, 2021 WL 2333521, at *1–2 (11th Cir. June 8, 2021) (quoting 42 U.S.C. § 2000e-3(a)). When a Title VII retaliation claim depends on circumstantial evidence, rather than direct evidence, "the three-part *McDonnell Douglas* burden-shifting

23

framework" is used. *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (footnote omitted). Under this framework, the plaintiff must first present a prima facie case, "which raises a presumption that the employer's decision was more likely than not based upon an impermissible factor." *Id.* Once a plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its decision or conduct. *Id.* "[I]f the [employer] offers a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to establish that the reason offered by the [employer] was not the real basis for the decision, but a pretext for discrimination." *Id.* (quotation omitted).

Turning to the first step in the *McDonnell Douglas* framework, "[t]o establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *Id.* (quotation omitted). In a retaliation claim, a materially adverse employment action is an action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation omitted). And to prove a causal connection, a plaintiff must demonstrate only "that the protected activity and the adverse action were not *wholly unrelated.*" *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (quotation omitted). This element is to be construed broadly, and "a plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there

24

was close temporal proximity between this awareness and the adverse employment action." *Id.* But the temporal proximity must be "very close." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). And if the alleged retaliatory conduct occurred before the employee engaged in protected activity, the two events cannot be causally connected. *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006) ("When an employer contemplates a given action before the harassment takes place, temporal proximity between the action and the incident of harassment alone will not suffice to show causation.").

### ii. Analysis

As best as the Court can decipher from Eliassaint's pleadings, he alleges that RTG retaliated against him for filing a complaint with the human resources department and for filing a charge with the EEOC by offering him a "significant pay cut and a demotion in response to his complaints of race and national origin discrimination" and by furloughing him.[4] (Doc. 33 at 19–20). But both alleged retaliatory actions lack the sufficient temporal proximity to establish a causal connection.

---

[4] In his complaint, Eliassaint also alleges that RTG "excluded [him] from [RTG's] team meetings" "[a]s a result of Plaintiff Eliassaint's complaints." (Doc. 1 at 6). But Eliassaint does not mention this conduct at all, much less as retaliatory conduct, in his opposition to summary judgment. *See* (Doc. 33); *See Gooden v. Internal Revenue Serv.*, 679 F. App'x 958, 966 (11th Cir. 2017) (declining to consider an "alleged adverse employment action[ ]" when the plaintiff "abandoned it by not addressing it in her response to summary judgment"). And Eliassaint fails to specify any date on which he was excluded from meetings. If the alleged exclusions occurred before Eliassaint filed his human resources complaint or EEOC charge, the two events cannot be causally connected. *See Cotton*, 434 F.3d at 1233 (holding that no causal link existed between the alleged retaliatory conduct and the plaintiff's

The Court is left to conjecture in the absence of clarity from Eliassaint's response, but it appears that his mention of RTG's offer of "demotion" and "pay cuts" refers to the positions that RTG offered him in response to Eliassaint's requests for transfer. RTG's conduct—offering Eliassaint other employment positions (which he ultimately declined) in response to his requests for transfer—can hardly be considered retaliatory.[5] Thus, RTG's response to Eliassaint's transfer requests are wholly unrelated to the filing of his human resources and EEOC complaint. Moreover, no causal connection exists between Eliassaint's EEOC charge and his transfer requests because the alleged retaliatory action (being offered employment positions in response to his transfer requests) occurred before he filed the EEOC complaint.[6] And the temporal

---

complaint of harassment where the decision to decrease her post-holiday work hours had been made and conveyed to her before she filed her charge); *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that the plaintiff could not prove a causal link where the employer contemplated demoting the plaintiff months before the plaintiff complained that the employer was interfering with his rights under the Family and Medical Leave Act). This means any meeting exclusions that occurred before October 10, 2017—the date that Eliassaint filed his human resources complaint—are not causally connected to any alleged retaliatory conduct, and Eliassaint points to no instances of being excluded from meetings after October 10, 2017.

[5] Additionally, although the standard for "adverse employment action" is different for a retaliation claim than a discrimination claim, RTG's conduct—offering Eliassaint transfer positions that he ultimately declined—does not constitute an adverse employment action for the reasons discussed above. *Compare Blue*, 453 F. App'x at 884 (explaining that, in a discrimination claim, "an adverse employment action includes "termination, failure to hire, or demotion" or "must, in some substantial way, alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee" (quotations omitted)), *with Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (explaining that, in a retaliation claim, a materially adverse employment action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (quotation omitted)).

[6] Eliassaint filed his transfer requests in April 2018 and did not file his EEOC complaint until February 2019.

26

proximity between Eliassaint's transfer request and his complaint with human resources is not "very close." Eliassaint filed his complaint with human resources in October 2017 and requested to be transferred in April 2018. This six-month delay is too long and attenuated to be causally connected. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."). And the lack of temporal proximity also dooms Eliassaint's retaliation claim based on being furloughed. RTG furloughed Eliassaint in April 2020, over a year after he filed his EEOC charge and approximately two and a half years after he filed his human resources complaint, far beyond the "close" temporal proximity required to show a causal relationship between the statutorily protected activity and the adverse employment action. *See id.* ("[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and adverse action, the complaint of retaliation fails as a matter of law.").

### d. Negligent Retention and Negligent Infliction of Emotional Distress

In his complaint, Eliassaint brings a negligent retention claim, alleging that RTG had a duty to protect Eliassaint from employees that it knew or should have known created a risk of injury to Eliassaint; that RTG was on notice of Beckham and Reed's harassment of Eliassaint; and that RTG breached its duty by continuing to employ Beckham and Reed and by failing to adequately supervise the workplace. (Doc. 1 at 22–23). Eliassaint also brings a negligent infliction of emotional distress claim, alleging that

RTG had a duty to protect Eliassaint from attacks, harassment, and retaliation; that RTG was on notice of Eliassaint's complaints of harassment and a hostile work environment; and that RTG breached its duty by failing to prevent the harassment against Eliassaint. (Doc. 1 at 23–24). Because the Court determines that these claims have been abandoned and are meritless, the Court grants RTG's motion for summary judgment on these claims.

First, although Eliassaint brings these two claims in his complaint, he never addresses them in his opposition to summary judgment. *See* (Doc. 33). RTG argues that Eliassaint abandoned his negligent retention and negligent infliction of emotional distress claims by failing to address them in his opposition to summary judgment response. (Doc. 40 at 2). The Court agrees and therefore grants summary judgment on Eliassaint's negligent retention and negligent infliction of emotional distress claims. *See Gooden v. Internal Revenue Serv.*, 679 F. App'x 958, 966 (11th Cir. 2017) ("[W]e will not consider this alleged adverse employment actions because [the plaintiff] abandoned it by not addressing it in her response to summary judgment.").

Alternatively, even if Eliassaint had not abandoned his claims, both claims fail. Under Florida law, negligent retention occurs when "during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further" actions such as investigation, discharge, or reassignment. *Garcia v. Duffey*, 492 So. 2d 435, 438–39 (Fla. 2d DCA 2006). Accordingly, liability for negligent retention attaches when an

28

employer "(1) knows or should know about the offending employee's unfitness and (2) fails to take appropriate action." *Martinez v. Pavex Corp.*, 422 F. Supp. 2d 1284, 1298 (M.D. Fla. 2006). A negligent retention claim "must be based on an injury resulting from a tort which is recognized under common law," *id.*, and Florida law requires "that an employee's wrongful conduct be committed outside the scope of employment," *Buckler v. Israel*, 680 F. App'x 831, 834 (11th Cir. 2017). Although Eliassaint alleges that Beckahm and Reed harassed him, he has failed to allege that either men acted outside the scope of their employment. Eliassaint also fails to point to a common law tort claim on which he bases his complaint. To the extent Eliassaint means to rely on Beckham's punches for the tort underlying his assault, the claim still fails because Eliassaint has produced no evidence that RTG "knew or should have known" about the conduct. *See Martinez*, 422 F. Supp. 2d at 1298–99. Thus, Eliassaint cannot establish a negligent retention claim under the facts presented.

Additionally, Eliassaint cannot establish a negligent infliction of emotional distress claim. Under Florida law, the a plaintiff must establish the following elements to succeed on such a cause of action: "(1) the plaintiff must suffer a physical injury; (2) the plaintiff's physical injury must be caused by the psychological trauma; (3) the plaintiff must be involved in some way in the event causing the negligent injury to another; and (4) the plaintiff must have a close personal relationship to the directly injured person." *Zell v. Meek*, 665 So. 2d 1048, 1054 (Fla. 1995). Eliassaint fails to proffer any facts which would support the third element of the claim: involvement in an event

that caused a negligent injury to another. Indeed, Eliassaint has made no allegation that another person was injured. Further, the claim is time barred by the action's four-year statute of limitations. § 95.11(3)(a), Fla. Stat. Eliassaint's only alleged physical injuries—the two punches—occurred in 2013 and October 2015. Even using October 2015 as the time his cause of action accrued, Eliassaint's claim is time-barred because he filed his complaint on December 6, 2019, over four years later.

Accordingly, it is **ORDERED**:

(1) Defendant RTG Furniture Corporation's motion for summary judgment (Doc. 28) is **GRANTED in full**.

(2) The Clerk is directed to enter judgment for RTG Furniture Corporation on all counts; terminate any pending motions and hearings; and to close the case.

**DONE** in Tampa, Florida, on July 29, 2021.

Kathryn Kimball Mizelle
United States District Judge